UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NUVASIVE CLINICAL SERVICES, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| NEUROMONITORING ASSOCIATES, LLC, *et al.*, | )<br>)<br>) |
| Defendants. | ) |

Case No. 18 C 4304

District Judge Pacold

Magistrate Judge Schenkier

## MEMORANDUM OPINION AND ORDER

Plaintiff NuVasive Clinical Services, Inc. ("NuVasive") filed this diversity action alleging that defendant Neuromonitoring Associates, LLC ("Neuromonitoring"), its sole member, Nick Luekenga and various other individuals stole NuVasive's customers in the intraoperative neuromonitoring services field by bribing doctors and paying them kickbacks and other improper conduct. On March 11, 2019, the sole remaining parties in the case — NuVasive, Neuromonitoring and Mr. Luekenga — reached a settlement at the conclusion of a court-mediated settlement conference, which was documented on that date with a term sheet they signed (doc. # 55). The parties thereafter signed a more formal settlement agreement, and on April 18, 2019, filed a stipulation of dismissal without prejudice, with jurisdiction being vested in the undersigned magistrate judge "over any violations of or disputes arising from the parties' settlement agreement" (doc. # 58).

NuVasive claims that defendants indeed have violated the settlement agreement, leading to NuVasive's motion to reopen the case and to enforce the settlement agreement (doc. # 59). The motion is now fully briefed (doc. # 69: Defs.' Resp; doc # 71: Pl.'s Reply). For the reasons set

forth below, we reopen the case solely for the purpose of adjudicating defendants' alleged violations of the settlement agreement, and we grant in part NuVasive's motion to enforce.[1]

### I.

NuVasive alleges that defendants have violated the settlement agreement in three respects: (a) by failing to make timely settlement payments; (b) by breaching the confidentiality term of the settlement agreement; (c) by violating a clause in the settlement agreement prohibiting defendants from hiring any persons employed by NuVasive for a one-year period ending on March 11, 2020; and (d) by operating a prohibited "partnership program" (Pl.'s Motion at 1-2). We address each allegation in turn.

### A.

The settlement agreement requires defendants to make a settlement payment to plaintiff of $100,000.00 in four equal installments of $25,000.00, with the payments due on September 1, 2019, January 1, 2020, April 1, 2020 and August 1, 2020 (Pl.'s Motion, Ex. 1: Settlement Agreement, ¶ 2).[2] There is no dispute that defendants did not make the first required payment until October 7, 2019, more than five weeks after it was due. In their response, defendants seek to minimize this late payment by chalking it up to an "inadvertent error" — defendants say they mistakenly sent the first payment to their attorneys, who placed the funds in their trust account, rather than directly to plaintiff (Defs.' Resp. at 3-4).

---

[1] Both the stipulation of dismissal (doc. # 58) and the settlement agreement (Pl.'s Motion, Ex. 1: Settlement Agreement ¶ 9) state the parties' intent to have the undersigned magistrate judge determine any disputes concerning, or claimed violations of, the settlement agreement. We therefore have consent of the parties to adjudicate this motion. *See* 28 U.S.C. § 636(c).
.
[2] The settlement agreement provides that the parties would keep confidential both the fact that defendants agreed to make a settlement payment and its amount (*Id.*). However, we disclose that information in this opinion for two reasons: (1) it is necessary to do so to explain our reasoning in reaching our ruling, *see In re Sprecht,* 622 F.3d 597, 601 (7th Cir. 2010); *see also Goeselv. Bosley Intern. (H.K.) Ltd.,* 738 F.3d 831, 834 (7th Cir. 2013 ("settlement terms are of potential public interest only when . . . the settlement is sought to be enforced"], and (2) as we discuss below, defendants have already breached the confidentiality provision.

This explanation is unpersuasive. *First,* defendants do not explain why, once the error was discovered on August 30, 2019 (*see* Pl.'s Motion, Ex. 2 (08/30/10 email)), defendants did not simply issue a new check directly to plaintiff and have defense counsel refund the funds once they became "untangled" from the trust account. *Second,* defendants do not explain why it took nearly four weeks, until September 26, 2019, to "untangle" the funds (*Id.,* Ex. 5 (09/26/19 email). *Third,* defendants do not explain why it then took eleven more days, until October 7, 2019, to actually remit the payment to plaintiff once the money became untangled from the attorney trust account. Defendants' course of conduct was that of parties who saw no urgency in ensuring that plaintiff timely received the payment for which it bargained — and which defendants agreed to pay.

Indeed, that lack of urgency continued with respect to the second payment. Despite the pendency of this motion, defendants failed to make the January 1, 2020 payment on time. Defendants did not even initiate the steps necessary to make the payment until January 24, 2020 (doc. # 67: Joint Status Report, ¶ 3 and Ex. B). Presumably, the payment now has been made, as plaintiff does not claim otherwise in the reply it filed on March 4, 2020. That said, defendants offer no explanation for the late January payment, and do not even mention it in their response to the motion. Defendants' failure to timely make the January settlement payment casts serious doubt on the defendants' attempt to attribute the failure to timely make the first payment to an inadvertent error.

We agree with defendants that plaintiff has not shown that it suffered any real damage from the late payments, as plaintiff itself has admitted by saying it would not have filed a motion to enforce if the only quarrel with defendants involved a question of late payment (Pl.'s Motion at 3-4). Thus, we impose no sanction on defendants for the failure to make timely payments. However, defendants' course of conduct with respect to the payment of the agreed settlement amount shows

a disregard for the need to comply with even the most basic terms of the agreement. Defendants' repeated failure to make the settlement payments on time, and their lack of any legitimate excuse for that failure, does not lay a solid foundation for the credibility of defendants' assertions concerning certain other alleged violations of the settlement agreement.

**B.**

The settlement agreement requires the parties to "keep confidential all aspects of the Settlement Payment, including, without limitation, whether a payment was made and the amount of any such payment" (Pl.'s Motion, Ex. 1: Settlement Agreement at ¶ 2). Sometime after the settlement was reached, Mr. Luekenga distributed a message to all NMA employees advising them of the settlement (Pl.'s Motion, Ex. 6). That message touted what Mr Luekenga said NMA had accomplished with the settlement, which of course was his right to do. Of significance here is one particular statement that NuVasive says goes too far and breaches the confidentiality provision of the agreement: the message said that "NMA was fiercely opposed to any financial settlement ***and therefore*** agreed to a moratorium on soliciting and hiring [NuVasive] employees for a year" (*Id.*) (emphasis added). There is no dispute that this message, while initially distributed only internally, ultimately found its way into a broader public dissemination on the internet.

Plaintiff says this disclosure violated paragraph 2 of the settlement agreement by — at a minimum — implying that the settlement did not require defendants to make any monetary payment. Defendants beg to differ, and assert that the statement that they "fiercely opposed" any financial settlement was completely accurate (Defs.' Resp. at 4). That argument is too clever by half, as it ignores the fact that "context matters." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* 566 U.S. 399, 413-14 (2012). The context that is relevant here, and that defendants ignore, is that immediately following the statement that they were "fiercely opposed to any financial settlement"

came the words "*and therefore*" defendants agreed to a no-solicitation, no-hire provision. The natural reading of the entire sentence, in context, links the defendants' willingness to agree to the no-solicitation, no-hire provision with their fierce opposition to (and thus refusal to pay) any financial settlement. We find that the sentence cannot reasonably be read otherwise. This statement plainly communicated that defendants did not agree to make any monetary payment as part of the settlement.

As a fallback argument, defendants contend that the settlement agreement did not bar them from revealing the payment terms to their employees, as it was necessary to do so in order to process the required payment to plaintiff (Defs.' Resp. at 4). This argument is makeweight. There was no need to tell every employee in the organization the payment terms (much less to falsely communicate that no payment was required) in order for someone in the accounting department to process payment.

Moreover, defendants' misrepresentation of the payment terms ultimately gained an audience outside of the company. Defendants say that this broader dissemination of the message does not violate the agreement, as the message was intended only for internal distribution within NMA and the NMA employees were told "to not distribute it to the public in any way" (Defs.' Resp. at 5 and Ex. 1 (Luekenga Decl. ¶ 4). We note that the Luekenga Declaration fails to disclose how he allegedly conveyed that non-disclosure information to the employees. It certainly was not communicated in the text of the message itself: the message does not state that there is anything confidential in the settlement agreement, and does not direct the NMA employees to keep anything in the message confidential. We do not find credible the assertion that Mr. Luekenga directed his employees to keep confidential a message that put a highly positive spin on the settlement and that

he says did not disclose anything about the only confidential part of the agreement: its monetary component.

In addition, even assuming that Mr. Luekenga took precautions to prevent the message from entering into the public domain, that would not be a defense to the claim of breach. We see nothing in the settlement agreement that relieves defendants of responsibility for inadvertent or unintentional breaches.

In sum, we find that defendants breached the confidentiality provision of the settlement agreement. In deciding the appropriate remedy, we consider that the entry in the public domain of misleading information about the payment terms of the settlement has increased the harm to plaintiff from the breach. As a remedy, plaintiff asks that the confidentiality provision of the settlement agreement be eliminated, and that plaintiff be permitted to discuss publicly the payment terms. We agree that this is a fitting remedy; all parties should be permitted to discuss publicly – and truthfully -- the payment terms of the settlement agreement (which in any event are disclosed in this public opinion). As a remedy for defendants' breach of the confidentiality provision, we therefore order that the confidentiality provision of the settlement agreement no longer has force and effect.[3]

## C.

As part of the settlement, defendants agreed not to "hire any current employees of [NuVasive] for a period of one year, beginning March 11, 2019 and ending March 11, 2020" (Pl.'s Motion, Ex. 1: Settlement Agreement, ¶ 5). Plaintiff says that as of March 11, 2019, it employed

---

[3] We reject the defense argument that plaintiff itself violated the confidentiality provision of the settlement agreement by publicly stating that "we cannot comment on, or confirm/deny, whether NMA paid [NuVasive] any money to resolve the lawsuit, or any amount of such a payment" (Defs.' Resp. at 5 and Ex. 2). Unlike defendants' misleading statement, this statement by plaintiff does not disclose or imply whether a payment was made.

6

three persons — Cohen, Combs and Gimler — who left the employment of NuVasive in June and July 2019, and by no later than August 2019 were engaged by NMA in violation of this provision.

Defendants do not deny that these individuals have performed work for NMA during the no-hire period set forth in the settlement. Rather, at the threshold, defendants say that plaintiff has offered no affirmative evidence — other than the assertion in its motion — that these people were NuVasive employees at the time of the settlement (Defs.' Resp. at 6). While true, we do not find that to be fatal to plaintiff's argument. In their response, defendants offered no evidence — such as, for example, declarations from these individuals — to undermine plaintiff's assertion. Moreover, we find no evidence in the many emails the parties exchanged over this issue before the filing of the motion that defendants ever disputed that these individuals were employed by NuVasive at the time of the settlement. Thus, while it surely would have been better for NuVasive to offer affirmative evidence from its own personnel files, for example, showing the employment of these individuals, in the circumstances we find no basis to question plaintiff's assertion that these individuals in fact were employed by NuVasive as of March 11, 2019.

Defendants' main argument is that their engagement of Cohen, Combs and Gimler does not violate the settlement agreement because NMA did not "hire" them — instead, NMA obtained their services through a temporary staffing agency (Defs.' Resp. at 6-7). We disagree that this method of procuring the services of Cohen, Combs and Gimler allows defendants to avoid the no-hire provision. "It is axiomatic that the law will not allow a party to do indirectly that which [it] is precluded from doing directly." *Sandra F. Monroe & Co., Inc. v. National Equip. Servs., Inc.*, No. 99 C 3120, 2000 WL 420746, * 5 (N.D. Ill. Apr. 12, 2000) (citation omitted). NMA is not exempt from this principle. It would be too easy for NMA to avoid the restrictions of the no-hire provision if NMA were allowed to achieve the same functional result by engaging a person through a

7

temporary services agency instead of simply hiring him or her. That is particularly true were, as here, defendants say that NMA routinely uses a staffing agency to fulfill its needs for technicians such as Cohen, Combs and Gimler (Defs.' Resp., Ex. 1: Luekenga Decl. ¶¶ 7, 13). Defendants' claim that they can get the benefit of the services of these individuals through a staffing agency when they could not do so by hiring them directly would interpret the no-hire provision in a way that renders it largely meaningless. We decline defendants' invitation to give the agreement that reading, and we thus find that NMA has violated paragraph 5 of the settlement agreement by engaging the services of Cohen, Combs and Gimler.

Defendants also say that they were unaware of any prior employment of Cohen, Combs and Gimler by NuVasive when the staffing agency first sent them to work for NMA (Defs.' Resp. at 7-8 and Ex. 1: Luekenga Decl. Para. 12). Even crediting that assertion, NMA knew as of August 2019 that NuVasive said NMA was violating the no-hire provision by engaging Combs and Gimler (Pl.'s Motion, Ex. 7 (08/02/19 letter regarding Gimler) and Ex. 10 (08/26/19 email regarding Combs)). In response, defendants could have asked the staffing agency not to send those individuals to perform services for NMA in the future. Defendants did not do so, and instead doubled down on the position — which we have rejected — that they were free to engage those persons through a staffing agency (*Id.,* Ex. 11 (09/05/19 letter regarding Combs and Gimler)). For all we know, those individuals continue to provide services for NMA. Any initial lack of knowledge by defendants of the employment history of these individuals does not absolve defendants of their breach of the settlement agreement.

We now consider the suitable remedy for that breach. Plaintiff asks that we extend the no-solicitation, no-hire provision for an additional year and convene a hearing to show the damages to NuVasive's business in the Hudson Valley region where Cohen, Combs and Gimler had worked

(Pl.'s Reply at 8). That requested relief is excessive in the circumstances. The no-solicitation, no-hire period expired about one month ago, and the evidence that these three former NuVasive employees — and no others — were engaged by defendants is an insufficient basis to seek to revive it now. And NuVasive has offered nothing concrete to support its assertions of damages in the Hudson Valley region that persuades us to open the door to an evidentiary hearing. In its letters to defense counsel last summer, plaintiff's counsel did not link the engagement of Cohen, Combs or Gimler to any damages suffered in the Hudson Valley region (but without explanation sought $25,000;00 for the alleged violation of the no-hire provision) (*see* Pl.'s Motion, Exs. 7 and 9). Nor has NuVasive offered any evidence that these individuals left the employment of NuVasive due to any overtures by defendants.

We also note that once defendants made clear their position in early September 2019 that they were entitled to engage these individuals, plaintiff then waited more than three months to file this motion. Had NMA's actions caused plaintiff damage in the Hudson Valley region, we would have expected more prompt action; and when the motion was filed, we would have expected *some* evidence of damages as a basis to convene the hearing that NuVasive now seeks. Neither NuVasive's motion nor its reply offers any.

Thus, we deny the relief that NuVasive seeks in connection with the violation of the no-hire provision. However, the violation of the no-hire provision should not go without any remedy. We find the more suitable remedy is to deny NMA the services of Cohen, Combs and Gimler for the one-year period of time required by the settlement agreement. To achieve that result, we therefore order that by May 8, 2020, defendants file with the Court a declaration stating the (1) dates on which each of those persons first was sent by the staffing agency to NMA to perform services, and (2) the length of time that each of them performed services for NMA. In the event

that any of those persons has continuously been staffed with NMA, then NMA must promptly cease using their services. We further order that NMA is barred from having Cohen, Combs or Gimler perform any services for NMA for the same amount of time after March 11, 2020 as each of those persons performed services for NMA for the period prior to March 11, 2020. We conclude that this remedy, along with an award to NuVasive of its reasonable attorneys' fees as the prevailing party on this motion to enforce as provided by the settlement agreement (Pl.'s Motion, Ex. 1, Para. 10), sufficiently addresses the breach that has occurred.

**D.**

We now consider plaintiffs' final request: that we permit discovery on the question of whether defendants were untruthful during the settlement conference about "their practice of compensating surgeons for utilizing their neuromonitoring services" (Pl.'s Motion at 2). Plaintiff says that defendants have violated paragraph 3(a) of the settlement agreement, which prohibits them from "compensat[ing] physicians, hospitals, or medical facility administrators, directly or indirectly, through monetary, equitable, or other means, for utilizing or recommending the utilization of their products, procedures, and/or services." The motion cited to a series of draft agreements (Pl.'s Motion, Ex. 14) showing the compensation scheme that plaintiff says violates Section 3(a).

As we pointed out during the hearing on January 29, 2020, plaintiff's motion is short on details to support its assertion. The motion did not explain precisely how the draft agreements attached as an exhibit to the motion show an improper compensation scheme, or offer evidence to support the specific assertions made by plaintiff. In the reply, plaintiff attempts to put more meat on the bones of its allegations. Plaintiff says that it has shown enough to warrant discovery to further develop evidence concerning the alleged violation, suggesting that it be permitted to serve

five interrogatories and eight requests for production of documents, and to take three depositions (Pl.'s Reply at 8-11 and n.15). We conclude that notwithstanding this effort, plaintiff has fallen short at this time of showing either a violation of the agreement or a sufficient basis to embark upon discovery.

Neither side does very much to fully explain the intricacies of each draft agreement or the interrelationship between them. However, focusing on the Management Services Agreement ("MSA"), that document provides for Monitoring Associates, LLC (which appears to be an entity related to NMA) to enter into management agreements with physicians who perform surgical procedures, including intraoperative neurophysiological monitoring. The MSA sets forth a detailed list of the scope of services Monitoring Associates will provide to the physicians, which includes billing for the professional work of the surgeons and collecting payment (Pl.'s Motion, Ex. 14, MSA, §§ 2-3). For the management services performed, Monitoring Associates would receive payment of 30 percent of net collections on the billings (*Id.*, § 4). Because the MSA provides for Monitoring Associates to bill for the services and to collect on all billings, the sense of the agreement is that the net collections remaining after payment of the 30 percent management services fee would be remitted to the surgeon.

Plaintiff has failed to explain sufficiently why this arrangement would violate paragraph 3(a) of the settlement agreement. On its face, remitting to a surgeon (or allowing her to retain) the balance of net collections after payment of a management fee does not constitute "compensating" the physician. Rather, it appears to allow physicians to retain a certain amount of the revenue they generated. We also note that the MSA states that no payments to the surgeon are intended to be "an inducement or payment for any referral" of patients to Monitoring Associates, and no payments by the surgeons of the management fee "include any discount, rebate, kickback or other

11

similar reduction in charge" (Pl.'s Motion, Ex. 14 at § 4). While simply reciting this in the MSA does not automatically make it so, it is equally true that plaintiff must do more to show a violation of the settlement agreement or an entitlement to discovery than summarily label the draft agreements as a "pay for play scheme" (Pl.'s Reply at 10). Plaintiff has failed to offer enough evidence at this time to show a violation of the settlement agreement or to warrant discovery. Accordingly, we deny this part of the motion without prejudice.

## II.

The settlement agreement provides that a party who demonstrates a breach is entitled to recover reasonable attorneys' fees (Pl.'s Motion, Ex. 1: Settlement Agreement ¶10). Plaintiff has demonstrated several breaches of the settlement agreement, and thus we award plaintiff reasonable attorneys' fees for drafting and filing the motion and reply memorandum, for its attorney time in preparing and filing the Joint Status Report required by the Court in connection with the motion (doc. # 67), and the attorney time spent on the in-court hearing on January 29, 2020. However, plaintiff shall exclude from its calculation of fees time devoted to the briefing on the alleged breach of the settlement agreement which the Court has found, in Section I(D), that plaintiff failed to demonstrate. Plaintiff shall provide defendants with a calculation of its reasonable fees by May 8, 2020. The parties then shall meet and confer as necessary in order to reach agreement on the amount of fees to be paid. The parties then shall file a status report with the Court on May 22, 2020, setting forth the status of their discussions concerning the amount of fees and a date for payment.

## **CONCLUSION**

Accordingly, for the reasons set forth above, we grant in part and deny in part plaintiff's motion to reopen the case and to enforce the settlement agreement (doc. # 59).

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: April 14, 2020**